**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*50 Main Street, Suite 1100*
*White Plains, New York 10606*

May 18, 2023

**BY ECF**
The Honorable Philip M. Halpern
United States District Court
Southern District of New York
300 Quarropas Street
White Plains, New York 10601

Re:   ***United States v. Deshawn Thomas a/k/a "Don,"* S6 20 Cr. 626 (PMH)**

Dear Judge Halpern:

      The Government respectfully submits this letter in advance of the sentencing of the defendant, Deshawn Thomas, a/k/a "Don," currently scheduled for May 25, 2023 at 4 p.m.  As described below, the defendant was a significant leader—the highest-ranked defendant in the S6 Superseding Indictment besides Dwight Reid, a/k/a "Dick Wolf," and Christopher Erskine, a/k/a "Beagle"—of the violent gang called the Untouchable Gorilla Stone Nation ("Gorilla Stone") that terrorized local communities and demonstrated a complete disregard for human life.  The defendant did it all; he both led and got his hands dirty.  He was not only the leader of a Gorilla Stone cave, he was personally involved in the full array of the gang's most serious criminal conduct, from selling multiple kilograms of cocaine, to purchasing numerous firearms for purposes of arming fellow Gorilla Stone gang members, to himself shooting at rival gang members, to helping fellow gang member Brandon Soto after Soto participated in a murder.

      For reasons further discussed below, the Government respectfully submits that a Guidelines sentence of 248 to 295 months' imprisonment, with a mandatory minimum term of imprisonment of 60 months which must be served consecutively to any other sentence imposed, would be sufficient, but not greater than necessary, to reflect the seriousness of the defendant's conduct, to promote respect for the law, to protect the public from the defendant's clear danger to the community, and to ensure adequate general and specific deterrence.  Probation calculates the same Guidelines range and recommends a sentence of 248 months' imprisonment, the bottom of the Guidelines range.  PSR at 34.

**A.      Background – Gorilla Stone Gang**

      As Your Honor is well aware, Gorilla Stone is a violent street gang that is a subset of the national Bloods gang.  Gorilla Stone was founded by Thomas's co-defendant Reid, and has a national presence.  Gorilla Stone has hundreds of members across New York State, including in

all five boroughs of New York City, throughout the New York State Prison System, and across the country—including in Florida.  PSR ¶ 16.

Gorilla Stone is comprised of eight different sets (or "Caves" as they are called by gang members).  Each Cave has its own leadership hierarchy and reports up to the respective leaders of its particular Cave.   Gorilla Stone, like most other Bloods street gangs, has two separate hierarchical rank structures: a "Prison Lineup" for Gorilla Stone members in the prison system, and the "Street Lineup," *i.e.*, members of Gorilla Stone who are not incarcerated.  These Lineups are designed to maintain discipline within Gorilla Stone Caves.  This is especially so for Street Lineups.  The descriptions of these ranks and responsibilities detail a highly organized and efficient street gang.  Most concerning is the organizational commitment to violence.  As laid out in the gang's "Department of Security" description, which was extracted from the iCloud account of the defendant, Gorilla Stone Caves have an individual who is responsible for "arming up" each Cave and enforcing internal laws. The investigation revealed that Gorilla Stone members violently enforced internal laws and had access to an alarming supply of firearms.  PSR ¶ 16.

Certain Gorilla Stone members and associates sold powder cocaine, crack cocaine, and marijuana in and around Manhattan, Brooklyn, the Bronx, Westchester County, Upstate New York, and Florida.  These members also possessed firearms in furtherance of their drug trafficking.

Gorilla Stone members and associates committed numerous acts of violence, including assaults, robberies, attempted murders, and murder to protect and expand their narcotics business, to protect fellow members and associates of the Enterprise, and to otherwise promote the standing and reputation of Gorilla Stone. PSR ¶ 17.

While many of the gang's activities may have targeted rival gang members, the gang's actions had devastating impacts on our communities.  Gorilla Stone members regularly carried guns, prepared to engage in shootouts, and when they engaged in shootings, they often did so in public.

**B.    The Plea Agreement and the Applicable Guidelines Range**

The plea agreement between the defendant and the Government stipulated that the defendant's Guidelines range is 195 to 228 months' imprisonment calculated based on the combination of: a Guidelines range of 135 to 168 months' imprisonment on Count One and a mandatory minimum term of 60 months' imprisonment on Count Seventeen, which must run consecutive to any term of imprisonment on Count One.  PSR ¶ 30.

<u>Acceptance of Responsibility</u>

However, the Guidelines range set forth in the plea agreement included a three-point reduction for acceptance of responsibility pursuant to United States Sentencing Guidelines ("U.S.S.G.") §§ 3E1.1(a) and (b).  As expressly stated in the parties' plea agreement, these points for acceptance of responsibility were contingent upon the defendant's "subsequent conduct prior to the imposition of sentence."  Thus, as the Probation Department concluded, PSR ¶ 70, where, as here, the defendant pleads guilty and thereafter acts in ways entirely contrary to an acceptance

of responsibility, the Court has considerable discretion to, and should, find that the defendant is no longer entitled to a reduction in points. *See, e.g.*, *United States v. Hirsch*, 239 F.3d 221, 226 (2d Cir. 2001) (upholding district court's decision to deny acceptance of responsibility credit where defendant's attempt to withdraw his plea "effectively recanted" his admission of guilt); *United States v. Cox*, No. 98-CR-850, 2001 WL 920260, at *11–12 (E.D.N.Y. Aug. 3, 2001), *aff'd*, 299 F.3d 143 (2d Cir. 2002). In this case, after pleading guilty, the defendant filed a motion to withdraw his guilty plea (Dkt. Nos. 472, 518) wherein, although not expressly claiming innocence, he effectively sought to disavow his plea allocution by implausibly asserting, among other things, that the plea allocution's words were not his and the first time he ever read them was as he read them during his plea allocution. The defendant also maintained that he desired to proceed with his pre-trial motions and, if necessary, proceed to trial. (Dkt. No. 472 at 6). The Court denied this motion, reasoning that Thomas's factual assertions in his motion to withdraw were belied and contradicted by his sworn plea allocution, and generally unpersuasive. (Dkt. No. 553 at 12-13). Accordingly, under these circumstances, the defendant is not entitled to additional points for acceptance of responsibility, and therefore the applicable Guidelines range is 248 to 295 months' imprisonment, calculated based on a combination of: 188 to 235 months' imprisonment on Count One, with a mandatory minimum term of 60 months' imprisonment on Count Seventeen, which must run consecutive to Count One.

The Guidelines provision applicable to Count One is U.S.S.G. § 2E1.1. Count One has two offenses that are each calculated separately—the narcotics conspiracy and aggravated assault. With respect to the narcotics conspiracy, the applicable guideline is U.S.S.G. § 2D1.1(a)(5) and (c)(4), with a base level of 30 because the defendant was involved in distributing between 5 and 15 kilograms of cocaine. PSR ¶ 54. With respect to the aggravated assault, the base offense level is 14, pursuant to U.S.S.G. §§ 2E1.1(a)(2) and 2A2.2(a), with an additional five points pursuant to U.S.S.G. § 2A2.2(b)(2)(A), for the possession of a firearm that was discharged during the assault. PSR ¶¶ 59-60.

In grouping the two offenses, the height offense level 30 is used, and no additional units are added because the offense level for the aggravated assault is more than 9 levels less serious. Accordingly, the base offense level for Count One is 30. PSR ¶¶ 64-65. Because the defendant was an organizer or leader of criminal activity that involved more than five participants, an additional four levels are added pursuant to U.S.S.G. § 3B1.1(a), resulting in a total offense level for Count One of 34. PSR ¶¶ 68, 71.

The Guidelines provision applicable for Count Seventeen is § 2K2.4(b) and the Guideline is the statutory mandatory minimum term of 60 months' imprisonment.

## Criminal History

The defendant has two prior convictions, including for criminal possession of a loaded firearm in 2003, for which the defendant was sentenced to 4 years' imprisonment. This conviction therefore results in three criminal history points pursuant to U.S.S.G. § 4A1.1(a). PSR ¶ 73. In 2016, the defendant was convicted of assault in the third degree and received a sentence of 180 days' imprisonment. PSR ¶ 74. Pursuant to U.S.S.G. 4A1.1(b), two criminal history points are

added, resulting in a total of five criminal history points, and a Criminal History Category of III. PSR ¶¶ 74-75.

With an offense level of 34 and Criminal History Category III, the Guidelines range for Count One is 188 to 235 months' imprisonment, which must run consecutive to the Guidelines sentence of 60 months' imprisonment on Count Seventeen, resulting in a combined Guidelines range of 248 to 295 months' imprisonment.

## Conduct While Incarcerated

The defendant has been sanctioned on multiple occasions while incarcerated. Orange County Correctional Facility records reflect that the defendant was sanctioned for a physical altercation and disobeying staff on February 8, 2021. Further, he was sanctioned for a fight involving multiple inmates on February 21, 2021. PSR ¶ 12. Likewise, records from the Metropolitan Detention Center ("MDC") show that the defendant was sanctioned for being in an unauthorized area and interfering with the taking of the count of inmates on November 23, 2021. PSR ¶ 13.

## C.    Discussion

### 1.    Applicable Law

As the Court is well aware, the Sentencing Guidelines still provide strong guidance to sentencing courts following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005). Because the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall v. United States*, 128 S. Ct. 586, 594 (2007), district courts must treat the Guidelines as the "starting point and the initial benchmark" in sentencing proceedings. *Id.* at 596. After that calculation, however, the Court must consider the seven factors outlined in Title 18, United States Code, Section 3553(a), which include the nature and circumstances of the offense, the individual characteristics of the defendant, and the need to adequately deter criminal conduct and promote respect for the law. *Id.* at 50 & n.6.

### 2.    A Guidelines Sentence Is Appropriate in This Case

The Government respectfully submits that a sentence within the Guidelines range of 248 to 295 months' imprisonment, with a mandatory minimum term of imprisonment of 60 months which must be served consecutively to any other sentence imposed, would be sufficient, but not greater than necessary, to achieve the legitimate purposes of sentencing.

> **(1) The nature and circumstances of the offense and the history and characteristics of the defendant and**
> **(2) The need for the sentence imposed—**
>    **(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;**

The nature and circumstances of the defendant's offense are extremely serious. The defendant was the leader of a Gorilla Stone cave, the "Immortal Stone Gorilla Gang Cave," also known as the "Goons," where he had responsibility for organizing and initiating Gorilla Stone members. PSR ¶ 44. He personally recruited individuals to join Gorilla Stone—in a recorded jail call he told one inmate that the inmate had "72 hours" to join Thomas's cave. PSR ¶ 44. Thomas also held a leadership role in a second cave—the Money Gang. PSR ¶ 44. Given the importance Gorilla Stone placed on loyalty to the gang and its violent missions, individuals like the defendant did not rise to leadership levels without demonstrating years-long dedication to the gang.

On October 14, 2020, a .40 caliber firearm was found in Thomas's car after a traffic stop in Queens. During that traffic stop, three cellphones were seized and the Government subsequently applied for warrants for all three cellphones. The cellphones confirmed that Thomas is a prolific narcotics trafficker. In fact, one of the seized cellphones primarily contains discussions pertaining to narcotics trafficking.

As a leader of two different caves, Thomas took an active role in all manner of violent and illegal conduct that Gorilla Stone members committed. PSR ¶ 45. The defendant sold multiple kilograms cocaine with fellow gang members and possessed guns in connection with this drug trafficking. The gang of course used the proceeds from his large-scale drug-dealing business to fund the overall violent mission of the gang. As Thomas's own background exemplifies, narcotics trafficking can devastate our communities, destroying the lives of not only those who become addicted to such narcotics, but the lives of those people's friends and family, and undermining any sense of safety for the entire community whose are required to live alongside the violence that is associated with the narcotics trafficking. Thomas spent many years out in the community glorifying a life of drug dealing, guns, and violence, and actively recruiting other young men to join him.

Thomas was not only integral to the Gorilla Stone's narcotics business, he was personally responsible for helping to arm fellow gang members with guns, knowing that they would be used to further the gang's violent missions. Thomas bought guns from Florida-based Gorilla Stone gang member and co-defendant, Jarrett Crisler, Jr., which Thomas then distributed to fellow Gorilla Stone gang members. Thomas also not only possessed guns, but he personally participated in violent shootings aimed at rival gang members. For example, on July 5, 2020, Thomas was in Florida with fellow gang members, including Caswell Senior, a/k/a "Casanova," when Thomas shot at rival gang members after Senior and rival gang members had already fired gun shots. This shooting took place at a party, where numerous bystanders were present and easily could have been shot and killed.

In addition to his own violent conduct, Thomas encouraged and assisted fellow Gorilla Stone gang members in connection with their violent gang activities. Law enforcement found several videos on Thomas's phone of gang members engaged in violent assaults. In one particularly gruesome beating, co-defendant Brandon Soto, a/k/a "Stacks," is seen beating a helpless victim (who appears to be unconscious after the severe beating) while screaming "YOU'RE NOT GORILLA." Thomas was also the gang member that Soto turned to after Soto helped commit a brutal murder of a juvenile and needed assistance. Specifically, Soto texted Thomas to delete the shooter's Instagram Account and, after the getaway car was towed to an

impound lot on September 25, 2020 by the New York City Police Department, that same day Soto sent panicked messages to Thomas:  "I need some assistance out here…," followed by "Idk what else to do."  Soto eventually burned the car in an arson.

In short, Thomas was an integral member of the Gorilla Stone gang and an active, senior, hands-on leader and participant in the many ways that the gang terrorized local communities.

       i.      <u>Need to Promote Respect for the Law</u>

For similar reasons, a Guidelines sentence is appropriate to promote respect for the law. The Gorilla Stone gang developed and operated according to its own code of conduct, which demonstrated no regard for the law.  The gang's core principles were in direct contravention of numerous laws and its members all considered themselves above the law.  As a dedicated member of Gorilla Stone, Thomas demonstrated a complete disregard for the law, day after day for years. Below is a description of the various roles and responsibilities in a Gorilla Stone Street Lineup, which was extracted from Thomas's iCloud account pursuant to a warrant.

RANK & RESPONSIBILITY

GF "Chairman":
As the hoods chairman the GF is accountable for setting an agenda  for the hood, that both uplifts itself and the banner; constructing a line up of individuals to carry out that agenda; and overseeing that line to make sure that individuals are fullfiling their obligations.

Highs/Lows "Advisory Boad:
As the hoods advisors to the GF the Highs and Lows are accountable for assisting the GF on decisions regarding the currect standing and direction of the hood; decisions on the line up and other decisions that will affect hood as a whole.

5 "Managment Office":
As the hoods management office the fifth floors job is to oversee each deparment. If one of the departments is open the management office is to take on that responsibility until it is filled. It is also the fifth floors job to report back to the advisory board.

4 "Dept. of Security":
As the hoods department of security the fourth floor is accountable for maintaing an accurate head count for the hood; running background checks and investigations; enforcing calls and law; and arming up each district.

3 "Dept. of Finance":
As the hoods department of finance the third floor is accountable for generating different avenues of revenue for the hood; maintaining the hoods funds; distributing the those funds amongst the departments for their expenses; and keeping an accurate account of all transactions. It is also the third floor job to collect kitty.

2 "Dept. of Education":
As the hoods department of education the third floor is accountable for knowing and distributing the lessons and history of the hood and banner; and being knowledgeable and effective in areas that are imperative to our growth and developement (such as : politics, economics, law, business, tactics, history.. etc).

1 "Dept. of Communication":
As the hoods department of communication the first floor is accountable for the establishment and maintenance of ports of contact for the hood.

The descriptions of these roles paint a picture of a highly organized, highly efficient street gang.  Most concerning is the organizational commitment to violence.  As laid out in the "Dept. of Security" description, Gorilla Stone Caves have an individual responsible for "arming up" each Cave—and enforcing internal laws.

The gang;s commitment to violence is reiterated in the 16 Gorilla Stone rules members must abide by.  Three of them, again recovered from Thomas's iCloud Account, are below:

1. NEVER LET THE ENEMY OF A RILLA LIVE AROUND YOU.....

2. AS RILLAS WE MUST CRUSH OUR ENEMIES ON SIGHT.....

11. COMMUNICATION IS A MUST, YOU MUST CHECK IN WITH SOME ONE IN YOUR CHAIN OF COMMAND IN ORDER TO KNOW WHERE YOUR GOING AND A LIST OF ENEMIES THAT HAS TO BE CHRUSHED ON SIGHT.....

As the Court is well aware, these rules are not careless musings. Gorilla Stone members have carried out numerous brutal acts of violence against rival gang members.

ii.   History and Characteristics of the Defendant

The Government acknowledges that the defendant faced an extremely difficult childhood due to his mother's addiction to crack cocaine and the fact that his father was rarely around growing up, and when he was around, was often abusive towards Thomas's mother. This is of course a factor for the Court's consideration and is no doubt a reason behind why Thomas chose to join the Gorilla Stone gang. However, the Government respectfully submits that given the nature of the conduct here, the fact that the defendant was such a critical leader of this incredibly violent gang, that he participated in the gang for years, including into his 30s, and was involved in virtually all aspects of the gang, it is not a sufficient reason for a below Guidelines sentence. Ultimately, the defendant made the decision to involve himself deeply in this violent gang and recruit other young men to join as well. The Government understands that the choices may not have been easy, but the defendant had the opportunity to choose to do something productive. He obtained his GED and completed an electrical trade program, but instead of further pursuing that, he chose to involve himself with the Gorilla Stone gang. The Government is further troubled by the defendant's decision to engage in a large-scale narcotics distribution conspiracy, given his personal knowledge of how such conspiracies can ruin people's lives. He and his fellow gang members profited off other people's addictions and Thomas did so with full knowledge of how harmful the drugs he was selling could be.

The Government further recognizes that the defendant has a devoted girlfriend and two young daughters. However, the defendant also chose to take a leadership role in the Gorilla Stone gang even after two prior convictions for which he received sentences of imprisonment, including a prior conviction for the possession of a loaded firearm and a prior domestic violence assault. The defendant was thus fully aware at the time he chose to involve himself in Gorilla Stone that doing so came at the risk that he would one day be caught, convicted, and sentenced to a lengthy term of imprisonment.

The nature of Thomas's prior assault conviction raises still further concerns for the Government.  As set forth in the presentence report, in 2016, the defendant punched his girlfriend in the face with a closed fist causing swelling, stole her cellphone by force, and then used a gravity knife to menace the victim and threaten to kill her.  PSR ¶ 74.  This is incredibly serious conduct and yet another example of Thomas's violent behavior.

And, as noted above, Thomas has also had disciplinary infractions while in custody in this case.  Specifically, he has been sanctioned for a physical altercation and disobeying staff on February 8, 2021, for participating in a fight on February 21, 2021, and for being in an unauthorized area and interfering with the taking of count on November 23, 2021.  PSR ¶¶ 12-13.  The defendant has also not attempted to participate in any educational programming while in custody.

**(2) The need for the sentence imposed—**
**(B) to afford adequate deterrence to criminal conduct;**
**(C) to protect the public from further crimes of the defendant; and**
**(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner**

A Guidelines sentence is also appropriate to ensure general deterrence.  Unfortunately, Gorilla Stone is just one of many violent gangs that operate in and around New York and recruit young members by glamorizing violence and drug trafficking and the money made off these illegal activities.  Indeed, while law enforcement's investigation in this matter led to the arrest of numerous members of Gorilla Stone, including high-level leaders, the gang continues to operate, both outside in our communities and within prisons.  A Guidelines sentence is therefore necessary to send the appropriate message that individuals who become active and contributing members of these violent organizations, and indeed, among its highest-ranking leaders like the defendant, will face a serious sentence of imprisonment.

A Guidelines sentence is further necessary to ensure specific deterrence and protect the public from further crimes of the defendant.  As set forth above, this is not the defendant's first conviction.  In fact, the defendant chose to commit the instant offense despite having previously been convicted of two other offenses, for which he received sentences of imprisonment.  Those prior sentences clearly did not deter the defendant from engaging in criminal conduct as his primary livelihood.  The fact that the defendant chose to engage with a violent gang, each and every day as his way of life, requires a significant sentence to achieve future deterrence.

Also worth noting here is also the defendant's conduct since pleading guilty.  The defendant filed a motion rejected by the Court that attacked his prior sworn plea, wherein he effectively claimed that his allocution was fabricated, wholly undermining any acceptance of responsibility that is the first step in the process of turning one's life around.  The Government thus has serious concerns that the defendant lacks adequate remorse for what he has done, has not fully accepted responsibility for his crimes, and thus cannot be trusted to change his behavior in the foreseeable future.

**(3) The kinds of sentences available**

There is no legal impediment to the Court's imposing the Government's requested sentence. The Government will submit a proposed order of forfeiture for $75,000.00, the stipulated amount agreed to in the parties' plea agreement, at the time of sentencing. The Government further agrees with the PSR's supervised release recommendation, as well as its recommendations of a $200 special assessment, and its supervised release special conditions.

**(4) The kinds of sentence and the sentencing range established for—**
**(A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines—**

As set forth above, a Guidelines range is appropriate in this case based on the offense conduct.

**(5) Any pertinent policy statement**

The Government is not aware of any pertinent policy statement. Since the defendant stipulated to quantities of powder cocaine, issues surrounding the sentencing disparities between crack and powder cocaine and the Eliminating a Quantifiably Unjust Application of the Law Act ("EQUAL Act of 2021") proposed legislation are not pertinent to Thomas's sentencing.

**(6) The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct**

A Guidelines sentence in this case would not involve unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct. Thomas's Guidelines range is in line with that of co-defendants who had significant leadership roles and were involved in many aspects of the gang's operations. For example, Donavan Gillard, a/k/a "Donnie Love," was sentenced to 248 months' imprisonment for participating in the racketeering conspiracy and possession of a firearm in furtherance of a narcotics conspiracy. Gillard, like Thomas, was a significant leader in the gang who, like Thomas, bought guns from co-defendant Crisler. Likewise, Crisler was sentenced to 207 months' imprisonment for his participation in a shooting and firearms trafficking. But Crisler, unlike Thomas, did not traffic as large a quantity of narcotics as did Thomas, did not have a criminal history, and was not as senior a leader as Thomas. Finally, Naya Austin, a/k/a "Baby," who also was not as senior a leader as Thomas and, unlike Thomas, did not participate in a gang-related shooting, received a sentence of 234 months' imprisonment.

**(7) The need to provide restitution to any victims of the offense**

The Government is not seeking restitution.

**D.      Conclusion**

For the reasons set forth above, the Government respectfully requests that the Court impose a Guidelines sentence of 248 to 295 months' imprisonment, with a mandatory minimum term of imprisonment of 60 months which must be served consecutively to any other sentence imposed.

Respectfully Submitted,

DAMIAN WILLIAMS
United States Attorney

by: /s/_____
Shiva H. Logarajah
David R. Felton
Courtney L. Heavey
Assistant United States Attorneys
Tel:  212-637-2272 /-2299 /-2413